## J. P. and M. T. Griffin v. The State.

1. **Embezzlement.** — The only safe guide in determining what constitutes the crime of embezzlement, and what persons are amenable to the charge, is to be found in our own Code and statutes, and in the adjudications thereupon.   Decisions of other states are to be consulted with great caution, in view of the very diverse character of their enactments on this subject.

2. SAME.—Under the law of this state, the offenses of theft and embezzlement are entirely separate and distinct. The case of *Riley* v. *The State*, 32 Texas, 763, which treats embezzlement as a species or degree of theft is hereby overruled.

3. SAME.—Our Penal Code defines embezzlement under two separate heads, the first being the embezzlement or misapplication of public money, and the second the embezzlement of property by private persons. The provisions of the Code, under this latter head, have been materially amended and extended by the act of May 25, 1876, and made applicable to attorneys who fraudulently misapply or convert the money or property of their clients.

4. SAME—INDICTMENT.—To constitute embezzlement under the Code as amended, it is necessary (1) that the accused occupy some one of the several fiduciary relations specified; (2) that the money or property belonged to his principal; and (3) that it came to the possession of the accused by virtue of his fiduciary relation to his principal. An indictment for this offense must sufficiently charge each of these constituents.

5. SAME—CASE STATED.—Indictment for embezzlement charged that the accused was the agent of a certain incorporated express company, and that, as such, he received $10,000, to be transported to a consignee at St. Louis; but further alleged that the money belonged to a certain bank, and neither stated that the express company had any property in the money, nor that any fiduciary relation existed between the bank and the accused. *Held*, that the indictment is fatally defective in substance, necessitating the reversal of the conviction and the dismissal of the case.

APPEAL from the District Court of Lamar. Tried below before the Hon. R. R. GAINES.

The following is the substance of the indictment:

"That one John P. Griffin, late of the county of Lamar, laborer, on February 5, A. D. 1878, with force and arms, in the said county of Lamar and state of Texas, was then and there an agent of the Texas Express Company, a corporation then duly established, organized, and existing under and by authority of the laws of the state of Louisiana as an incorporated company, and being then and there a carrier of moneys, goods, wares, etc., from point to point, having an office and doing business at Paris, Lamar County, Texas, as well as at other points in said state of Texas, under and by authority of the laws of said state of Texas;

and that he, the said John P. Griffin, then being stationed by said Texas Express Company at Paris, in said county and state, as such agent, did then and there, by virtue of his said agency, receive and take into his possession, for and on account of said Texas Express Company, a certain package containing $10,000, circulating medium, current as money, of the value of $10,000, from J. E. Roberts, cashier of the Paris Exchange Bank, a corporation duly established, organized, and existing as an incorporated bank, by virtue of the laws of said state of Texas, and doing business at Paris, in said county, he, the said John P. Griffin, then and there having power and authority, as such agent, to receive and take into his possession said package of money for, and in the name of, the said Texas Express Company; which said package of money was then and there to be carried from said office by him, the said John P. Griffin, to the railroad depot at Paris, Lamar County, Texas, and there to be delivered by him to the first messenger of said Texas Express Company going toward the destination of said package of money, to be carried by the said Texas Express Company to Bartholow, Lewis & Company, St. Louis, Missouri, to whom the same was then and there addressed.

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present that one Maurice T. Griffin, brother to the said John P. Griffin, was then and there in said office of the Texas Express Company, doing business with the said John P. Griffin, and was then and there a clerk or agent of the said John P. Griffin, aiding and assisting him, the said John P. Griffin, in the discharge of his, the said John P. Griffin's, duties as such agent of the said Texas Express Company, and so doing business together as aforesaid; and the said Maurice T. Griffin, being then and there clerk or agent of the said John P. Griffin, as aforesaid, they, the said John P. Griffin and the said Maurice T.

Griffin, on February 5, A. D. 1878, in the county and state aforesaid, by conspiring, combining, agreeing, counseling, and acting together, assisting and aiding each other, did feloniously embezzle and fraudulently convert to their own use said $10,000 in money, without the consent of the said Texas Express Company, and without the consent of the said Paris Exchange Bank, and without the consent of the said Bartholow, Lewis & Co., they, the said John P. Griffin and the said Maurice T. Griffin, then and there well knowing that they were not entitled to said money, with the intent to defraud and to appropriate the same to their own use and benefit, said package of money being then and there the property of the said Paris Exchange Bank.

"And so, the grand jury aforesaid, upon their oaths aforesaid, do say that the said John P. Griffin and the said Maurice T. Griffin, on the 5th day of February, A. D. 1878, in the county of Lamar, in said state of Texas, with force and arms, in the manner and form aforesaid, did feloniously embezzle and fraudulently convert to their own use said ten thousand dollars in money, the property of the said Paris Exchange Bank, without the consent of the said Texas Express Company, and without the consent of the said Paris Exchange Bank, and also without the consent of the said Bartholow, Lewis & Co., with the intent to defraud, and to appropriate the same to their own use and benefit, contrary," etc.

No exception or demurrer to the indictment was filed, but by a motion in arrest of judgment its sufficiency was questioned, on the grounds discussed in the opinion, and the further ground that Maurice T. Griffin was not alleged to be an agent or employee of the express company or the bank.

The jury found both defendants guilty, and assessed their punishment at two years in the penitentiary, and the motion in arrest of judgment was overruled.

This case has elicited no ordinary amount of interest and discussion, and the present record fails to clear up all the mystery which enshrouds the transaction.   The trial was had at the spring term, 1878, of the court below, on the plea of not guilty, entered by both defendants.   An unusually large number of witnesses were examined, but there is occasion to detail the testimony of but a few.   Preliminary and collateral facts, such as the agency of John P. Griffin, and his receipt of the money for express to St. Louis, were fully proved.   The cashier of the bank described the package as about eight inches long, five and a-half wide, and three and a-quarter thick, tightly secured with twine, and it was delivered to J. P. Griffin about four o'clock, P. M., of February 4, 1878.

J. A. Fitzgerald, for the State, testified that he was a messenger of the express company, and his route lay between Sherman and Texarkana.   On the night of February 4, 1878, he, as such messenger, was on the train bound east, and which passed the town of Paris, in Lamar County, about half-past twelve o'clock that night.   On that occasion he received from John P. Griffin four small money packages and several boxes of freight, destined for different places.   He received no package containing $10,000, nor any package addressed to Bartholow, Lewis & Co.   This was the first train which passed east after four o'clock, P. M., of February 4th.   It had been the custom for John P. and Maurice Griffin to come alternately to the train with the matter to be expressed.

On cross-examination, this witness stated that when John P. Griffin, on the night in question, came into the express car, there was mud or dirt on his face, his eye was blackened, apparently by a blow, his hand was wrapped up and bleeding, and he was pretending to cry.   He told witness that he had been knocked down and robbed.

C. T. Campbell, for the State, testified that he was the

superintendent of the Texas Express Company, and that the $10,000 which was lost had been paid by that company to the Paris Exchange Bank. On February 7, 1878, witness offered a reward of $500 for the apprehension of the robbers, with proof to convict them, and ten per cent of the money recovered.

E. F. Warren, the most interesting of the State's witnesses, testified that he had known John P. Griffin more than a year, and Maurice Griffin about six months. He knew John better than the other, and might be called his friend. On February 16, 1878, John P. Griffin came into the store of Webster & Fisher, where witness was clerking, and asked witness to come round to the express office, and witness agreed to do so as soon as the store should be closed. Griffin came to the store a second and a third time that day, and, on the third call, said he wanted to talk with witness on particular business, and told witness to come into the office and walk through into the bed-room, and take a seat on the side of the bed. When witness went, he did walk through the office into the bed-room, and sat down on the bed, and soon afterwards heard Griffin close and lock the outside door. He then came into the bed-room and sat down on the bed by witness' side, and said he had something to talk to witness about, but wanted no one to see him and witness talking together. He said: "What I am about to tell you I would not tell to another man in town;" and that he had a proposition to make, which, if witness would not accept, he wanted him never to breathe it. Witness promised he would not, and asked him what it was. Griffin then said: "You know there has been much talk and excitement about the express robbery. We are young men, you from Alabama and I from Georgia, and we don't want to be dry goods clerk and express agent all our lives ; and if I should tell you how you can make $2,000 in the next twenty-four hours, would you do it?"

Witness told him that $2.000 in twenty-four hours, to a poor man, was a very tempting proposition, and that if he would tell witness how he could make that amount of money in that time, without tarnish to his reputation, he would do it ; and witness asked him what his proposition was, adding that he would not accept anything till he knew what it was. He then said : " Suppose I were to tell you that I knew where the $10,000 that was robbed from the express company was at, and were to tell you just where you could go and put your hand on it, and put it in your trunk, and keep it eight or nine months, till this thing all blows over ; would you do it?" He further said : " Mind, now, I don't implicate myself ; I don't say I do know where it is ; but suppose I were to tell you that I did know where it was, and where you could put your hand on it, and put it in your trunk, and keep it nine or ten months ; would you do it?" Witness told him no ; that he would not tarnish his reputation for $2,000 ; that his character as an honest man was all he had to sustain him. Griffin then told witness not to breathe to any one what he had said ; and witness assured him that he would not, and left the office.

After narrating some unimportant matters, the witness stated that on the next morning — which was Sunday — February 17th, he took a walk with Mr. J. C. Conway, and told him what had passed between witness and Griffin the previous night, and also told Conway that he (witness) had been working sometime to get some points in the robbery case, and had agreed to work it up if he could. After returning from the walk, they went to the house of Major W. B. Wright, and witness informed him of what had taken place between Griffin and witness the night before. It was then planned that witness should take a buggy-ride with Griffin that evening, and hear his proposition in full. From Major Wright's, Conway and witness went to Griffin's office, and witness proposed to get a buggy, and it was

agreed that witness and Conway should ride first, and then witness and Griffin.   Conway dined with witness at his boarding-house, and after dinner witness got a horse and buggy from a livery stable, and he and Conway took a drive.   On their return they drove up in front of Griffin's office, and there Conway got out and John P. Griffin got into the buggy.   Witness and Griffin drove out on the Bonham Road, and, when they got about a mile from town, witness made some remark about hard times and low wages, and said he often felt desperate, and thought a good plan for a man to adopt was to make all the money he could, any way he could, and that he had been thinking over Griffin's proposition of the night before, and would accept it if it was practicable.   Griffin then told witness he suspected as much when witness proposed the buggy-ride, and witness replied: "Yes; I will accept the proposition if you will tell me how I can get hold of the money and not be suspected."   A good deal of talk ensued, during which Griffin told witness that the $10,000 of which the express company had been robbed was under the Cumberland Presbyterian church, in two cigar-boxes, on the middle sill of the church, and filling, as witness then understood him, the entire space between two sleepers.   Griffin proposed that witness should get the money, put it in his trunk, and keep it nine or ten months, and he would give witness $2,000 of it; and witness promised to get the money that night.   Griffin further said that if witness ever told anybody about the matter, there would be somebody killed, or some shooting.   Returning to town, Griffin got out at his office, and witness returned the horse and buggy to the stable.

Witness soon met Ulmer, a policeman, and told him of what had passed between himself and Griffin, and asked Ulmer to accompany him in going after the money.   This was about sun-down, and witness and Ulmer went to the church and got under it, and searched the middle sill from

one end to the other, but found no money. They then took different directions back to the public square, and there witness met Conway and G. G. Wright, a son of Major W. B. Wright, and assistant cashier of the Paris Exchange Bank. Witness told them what he had done, and was proceeding to his boarding-house, when he met John P. Griffin, who asked witness where he and Ulmer had been to ; and witness at once saw that Griffin's suspicions were aroused, and told him that Ulmer was a candidate for city marshal, and that witness was a strong supporter of his, and that he and Ulmer had been talking about the canvass for marshal. Witness went to his supper, and then returned to the church and again searched the middle sill, and on the south side, and still found no money.

About eight o'clock that night witness met John P. Griffin, and told him he had searched for the money and failed to find it. He asked witness where he had searched, and witness told him on the middle sill, and on the south side. Griffin said : "There is where you were wrong; the money is on the north sill of the north side of the church, a little in front of the middle, in two cigar-boxes, and having the appearance of being solid." He soon left, and witness again went to the church, and, just before reaching it, met W. B. Wright, Dr. Morris, Willie Ownby, and G. G. Wright; and witness told them he had hunted the wrong place for the money, and he and G. G. Wright then went under the church and hunted the entire north side, but found no money.

The next morning witness went to Griffin's office, and told him he had failed to find the money, and he seemed much surprised. It was arranged between them that at any time Griffin wished a conference with the witness, he would come to the store and ask to see some clothing, and they would go up stairs, where the clothing was kept, and where they could talk to each other. That evening Griffin came,

and they went up stairs, and there Griffin gave witness a rough diagram of the foundation of the church, with a description in writing, which stated that the money was on the north sill, a little in front of the middle, and that there was a large rock just under the eave of the house; and that about three feet in front of that rock, in two cigar-boxes, filling the entire space between two sleepers, and presenting the appearance of being solid, witness would find the money. That night G. G. Wright and witness took a lantern and hunted the entire church, on all the sills, and found no money.

On the next morning, or the morning following, Maurice Griffin came into the store, and he and witness went up stairs. He showed witness a diagram in pencil, showing the money to be in the same locality designated by John P. Griffin; he said the money must be there, unless it had been moved. Witness replied that he had searched there so thoroughly that he was satisfied it was not there. Maurice Griffin said, then it must have been moved by some one, as he had hidden it there himself, and, unless it had been moved by other hands than his, it must still be there. Within the next three or four days two or three other conversations took place between witness and one or other of the Griffins, in which they still insisted that the money was there, but advised a delay of a few days before looking again.

About February 21, 1878, witness had his first direct conversation with the detective police, having previously communicated with them through G. G. Wright. Witness was working up the case for $2,000, which he had been promised if he would recover the money, and not for the conviction of the Griffins, who, according to his understanding, were not to be prosecuted if the money should be recovered; and he never attempted to ferret out the circumstances of the robbery. It was only the money he was concerned about.

On February 25th, John P. Griffin came into the store, and witness told him he thought that Maurice knew where the money was, and was trying to beat them out of it; that he (witness) thought that he (John) had told the truth about the matter, but that Maurice had not; that he (witness) thought that Maurice knew where the money was, and that he (John) did not. The next night witness went to Griffin's office, and Maurice contended that the money was just where he had said, and asked witness what he had been saying to John that morning; and witness told him all he had said. Maurice said that was a grand mistake; that he knew no more about the money than witness did; that if it had not been moved by other hands than his, it was still there, for he hid it there himself; that the evening the money was brought to the express office he went out two or three times to find a place to hide it, and finally decided on that place. Maurice then told witness that it was the best laid scheme witness had ever seen, and he had planned it all himself; that his first idea was to stop John on his way to the depot, and make him give up the money, but then concluded that would not do, as they would have been dropped on, certain. He said that when the money was brought from the bank, he told by actual measurement how much there was, and that it was not bonds, but $10,000 in fives, tens, and twenties. He said, "Suppose we had broken the seals, and that night about eight or nine o'clock the bank officers had concluded not to send it, and had come in to get it, we would have been in a fix then;" but that, as it was, the detectives were at their wit's end, and no one but those concerned knew that he left the office the night the money was taken. Witness then remarked that John gave himself a pretty good lick; and he said yes — that had to be done. During their Sunday buggy drive, John Griffin had told witness that Maurice had opposed taking in a third party, but that he did not see how the

matter could be run without doing so, and that he over-ruled Maurice, and selected witness as a man no one would suspect.   On the evening following February 17th, John P. Griffin approached witness in the street, with his hand on his pistol, under his vest, and said that some one had told him that witness and a taller man had been seen go under the church, and witness heard to say " he said he put it under here ; " and witness asked him who told him so.   He first refused to tell, but said that his informant lived near the church, and had an office in town.   Witness then asked him if it was not Dr. Morris, and he said it was, and that Dr. Morris had invited him in his office and told him about it, and said that he had been betrayed.

On his cross-examination, this witness did not remember saying in the presence of John Clay and Mrs. Martin that he had a dead thing on $500, anyhow ; nor of telling Dr. Morris and Willie Ownby that he believed the Griffins were giving him away, or lying to him, and that he intended to prosecute them, G—d d—n them —put them in the peni-tentiary, and get the $500.   Witness' understanding from Major Wright, on Sunday morning, February 17th, was that if witness recovered the $10,000, he was to have $2,000, and the Griffins were not to be prosecuted.   Nor did witness remember telling Willie Ownby that he had betrayed the confidence of the Griffins, and that it was the d—dest most serious thing he was ever engaged in, and hurt his conscience more than anything he ever did.   Witness talked to Willie Ownby about the matter, but had no recollection of making such a statement.   Nor did witness recollect a conversation with Judge John C. Easton, when the latter told him he had heard that witness said the Griffins had admitted they had the $10,000 of which the express com-pany had been robbed, and had offered witness $2,000 to keep it for them nine or ten months ; and in reply to which,

witness told Judge Easton it was a d—d lie; the Griffins had told him no such thing.

Neither did witness remember that, in answer to an inquiry by Dr. J. R. Jones, why witness delayed so long in going for the money after John Griffin told him where it was, his reply was that he was afraid the express company would accuse him of the robbery if he produced the money. But witness did tell Dr. Jones he wanted some responsible party to be with him when he found the money, so as to relieve him of all suspicion; and, therefore, he got policeman Ulmer to go. Witness acknowledged that he had made evasive answers to questions asked him by people, his object being to conceal what he was doing, and that he had made false statements to the Griffins, as he thought any man ought to do in order to catch a thief.

The diagram and written description which was given witness by John P. Griffin, witness put in his pocket, but Griffin immediately asked him for it, saying it might get lost; and, on witness handing it back to Griffin, the latter tore it up. Witness had lost the diagram given him by Maurice Griffin. When John P. Griffin took the buggy-ride with witness, the latter took a bottle of whisky along; witness had taken a drink or two before they started, and took one or two while they were driving, and was somewhat under the influence of whisky.

The defense introduced John Clay and Joe Martin, who testified that in their presence, and the presence of Mrs. Martin, the State's witness, Warren had said that he had a dead thing on $500, anyhow. Willie Ownby, for the defense, stated that Warren said, in his presence, that he believed the Griffins were giving him away, and, d—n them, he now intended to put them in the penitentiary and get the $500; and further, that, in reply to a question by witness, he said that he had betrayed the

Griffins — had obtained their admissions by getting into their confidence — and that it was the d—dest most serious thing he had ever undertaken ; and he felt meaner about it than anything he had ever done in his life.

The witness Ownby testified, also, that on Sunday night, February 17th, he saw the State's witness Warren come out from under the Cumberland Presbyterian church, and walk rapidly from there to the store he was clerking in, open the door, go in, and close the door behind him. There was no light in the store, and no one besides Warren came out from under the church. Warren walked buoyant, and rather rapidly, from the church to the store. Witness and W. B. Wright followed him until he entered the store.

Judge John C. Easton, for the defense, testified that, having met Warren shortly after the arrest of the Griffins, he said to him that it was reported that the Griffins had confessed to him that they had the money, and offered him $2,000 of it to keep it for them awhile ; and that Warren replied to witness : "It's a d—d lie ; they never told me any such a thing, or made any such a proposition." Judge Easton thought the reply appropriate, as he had no business to ask such a question.

Dr. J. R. Jones, for the defense, testified to a conversation in which the witness Warren told him that the reason he did not sooner go and try to get the money, after Griffin told him where it could be found, was because he was afraid if he went alone and got it, and brought it up, the express company would accuse him of the robbery ; and then he would be in a bad fix.

James Brame, for the defense, testified that he was in a hotel close to the depot when the robbery was said to have occurred, and had seen John Griffin at the depot a few minutes previously. While in the hotel, witness heard three gun or pistol-shots, which seemed to be about the west end of the platform. Witness had left a team standing near

the platform, and, fearing it would run away, he started over there, and met John Griffin, who was crying, and was calling for witness, and who said that some d——d rascal had robbed him, or he thought had robbed him. He had received a blow above his eye, which blackened it; there was mud or dirt on his face, and his hand was bleeding. He said he thought he was robbed of $10,000; that he had been knocked down on the west end of the platform, and, as he recovered from the blow, he saw two men going off west from him, but could not tell whether they were white men or negroes. Witness made a search around, but found no person nor thing. The east-bound train arrived in about half an hour afterwards. Griffin telegraphed the robbery to Texarkana, and asked witness to see that the livery-stable let no one have a horse. Griffin said he fired two of the shots at the men he saw going off, and one of them fired one shot back at him.

Davis, for the defense, stated that he and others were in the ladies' room of the depot when the robbery occurrence took place, and about half an hour before it happened he noticed two strangers walking on the platform. Witness heard three or four shots, and when he first saw John Griffin, he noticed that his hand was bleeding, his eye bruised, and mud or dirt on his cheek. He said he had been knocked down and robbed by some persons unknown to him, and that, as he got up, he saw two men going off.

Quite a number of other witnesses, for both the prosecution and the defense, were examined; but there is no occasion to notice their testimony further than to say that none of them solved the question of what became of the money.

*Hale & Scott*, for the appellants, filed an able brief and argument.

*George McCormick*, Assistant Attorney-General, for the

State. The indictment alleges the ownership of the property so embezzled to be in both the express company and the Paris Exchange Bank. This was the fact — the absolute ownership being in the bank, and the express company having only a qualified ownership.

Appellants were the agents, under the facts of this case, of both the company and the bank, and received the money as such agents. This indictment charged that the property was taken without the consent of either, and the court, in his charge to the jury, instructed them that, to constitute the offense, it must have been taken as alleged.

Again, the defendants were the agents of both the bank and the express company — of the bank in receiving the money to be delivered as directed, being a carrier; and of the company as being in charge of their business, and in being authorized to act for them in the capacity in which they received the money. The indictment charges that Griffin received the money from the bank, to be carried to the railroad depot, and " then and there delivered to the first messenger of the express company going in the direction of the destination of the money." This was, in itself, an allegation of agency sufficient to admit proof of such fact of agency.

Under this view of the case the indictment charged the offense as made by the statute — that is to say : first, that Griffin was the agent of the Paris Bank and of the express company ; second, that by virtue of such agency and employment he received from the bank $10,000, the property of the bank, and " for and on account of the express company ; " third, that, without the consent of the bank or the express company, he fraudulently embezzled and converted the money to his own use.

These three constituents of the crime of embezzlement were sufficiently alleged. The court, with this view of the case, instructed the jury correctly upon the law, gave them

the statutory definition of the offense, and told them that the proof must show a want of consent to the taking in both of the principals of the defendants. *Johnson* v. *The State*, 21 Texas, 775; *Riley* v. *The State*, 32 Texas, 763; *Brooks* v. *The State*, 42 Texas, 62; *Wise* v. *The State*, 41 Texas, 139.

The defendant M. T. Griffin was charged as a principal, though not, in the strict sense of the term, either a clerk or agent of the express company or the bank; yet he was alleged to have been present, and to have acted with his brother in the commission of the offense. Pasc. Dig., arts. 1809, 1810.

Winkler, J. This is a prosecution for the crime of embezzlement, under article 771 of the Penal Code, as amended by act of the Fifteenth Legislature, which is as follows:

"If any officer, agent, clerk, or attorney at law of any incorporated company or institution, or of any city, town, or county; or if any clerk, or agent, or attorney at law of any private person or copartnership; or if any consignee or bailee of money or property, or town, city, or county scrip, or of any draft, promissory note, bank-bill, national bank-note, treasury-note of the United States of America, or any article of value, shall embezzle, or fraudulently misapply, or convert to his own use, without the consent of his principal, employer, or client, any money, property, town, city, or county scrip, or any draft, promissory note, bank-bill, national bank-note, treasury-note of the United States of America, or any article of value, belonging to such principal, employer, or client, or the proceeds of such property, after the sale thereof, which shall have come into his possession, or shall be under his care by virtue of such office, agency, or employment; and if the value of the property, or money, or other article so

embezzled, shall be twenty dollars or over, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years. If the value of such property, money, or other article shall be less than twenty dollars, he shall be punished as for theft of property under the value of twenty dollars. Within the meaning of money, as used in this article, is included any circulating medium current as money." Gen. Laws 1876, p. 9.

After the defendants had been tried and convicted, and after the overruling of a motion for a new trial, the sufficiency of the indictment was called in question, by a motion in arrest of judgment, set out in the record as follows:

" 1. Because the indictment charged that the defendant John P. Griffin was the agent of the Texas Express Company, and, as such, received the money charged to have been embezzled, and also charges and lays the ownership of the money in the Paris Exchange Bank, and is, therefore, insufficient, and will not support the judgment of conviction of either of the defendants.

" 2. The indictment is not sufficient to support the conviction of the defendant Maurice T. Griffin for embezzlement, for the want of an allegation that he was an agent, clerk, or bailee of the Texas Express Company.

" 3. The indictment is not sufficiently descriptive of the property embezzled to admit proof, and will not support the judgment."

The motion in arrest of judgment was overruled, and the action of the court upon the motion is assigned as error. Agreeably to elementary writers on criminal law, when the statutes creating the offense of embezzlement were first enacted in England—where it originated, and from whence it has found its way to, and been legislated upon by, American states—it was originally intended to correct certain real or imaginary defects in the law of larceny; and it has been said of one of the first of these statutes (21 Henry VIII., ch.

7) that it "seemed to have been a sort of attempt to define and to extend the doctrine of larceny." 2 Bishop's Cr. Law, sec. 326. Upon examination, however, it will be found that, since the first enactment on the subject, it has taken a far wider range, both as to the subjects of the crime, as well as to the persons subject to its commission; and, hence, we find an American author of high standing using the following language: "Our law of embezzlement, therefore, had its origin in the English statutes — not in the common law of England, nor in any statutes which, by reason of their early date, became common law with us." 2 Bishop's Cr. Law, sec. 330.

In this connection it should be noticed that whilst the statutes of England, to some certain date or reign, were adopted, together with the common law, by statutory enactment, in several of the American states, yet such was not the case in Texas. The statutes of England were never adopted as such in this state. Several definitions of the offense have been attempted — as, that "the offense consists in embezzling such property as the statutes point out, and by such persons and under such circumstances as they specify;" or, as proposed in New York, "the fraudulent appropriation of property by a person to whom it has been intrusted." The author from whom we have been quoting prefers this definition: "Embezzlement is the fraudulent appropriation of such property as the statutes make the subject of embezzlement, under the circumstances in the statute pointed out, by the persons embezzling, to the injury of the owner thereof." 2 Bishop's Cr. Law, sec. 332.

But of this the author says, in the conclusion of the section: "It is true that this does not appear to be really a definition at all; and, indeed, there is a sense in which it is not, because, of necessity, since the offense is statutory, we are to look to the statute for its exact limits." And, treating further of this subject, the same author has given the

following well-timed admonition: " Seeing that the statutes are numerous, and the provisions diverse, in some respects, from one another, the practitioner will be cautious about coming to conclusions upon a question under the law of embezzlement, unless, when he examines a decision relied upon, he first sees whether the statute on which it was rendered is, in its terms, the same with the one in his own state." *Ibid.*, sec. 331.

We are of opinion that not only practitioners, but courts, might well give heed to the admonition.

Mr. Wharton, speaking of the English and American statutes concerning embezzlement, and the *two gaps* in the law of larceny they were intended to close up, so as to prevent the escape of the offender, says:

" To cure these defects were passed the embezzlement statutes of England and most of the United States. These statutes were intended simply to establish two new cases of larceny. If a servant (and this is the first of the two) steals his master's goods *before they have arrived into his master's possession*, he, the servant, shall be guilty of larceny. And the second is that it shall be larceny for a trustee or bailee to fraudulently convert to his own use his master's goods he may have, *bona fide*, received. Now, as neither of these cases are larceny at common law, the statutes of embezzlement in no way overlap the old domain of larceny. They were passed solely and exclusively to provide for cases which larceny at common law did not include. Hence, nothing that is larceny at common law is larceny under the embezzlement statutes, and nothing that is larceny under the embezzlement statutes is larceny at common law. It is important to keep this in mind, as from missing this point some confusion in construing the embezzlement statutes has been produced. And by applying this text we find that the embezzlement statutes fall in two distinct and widely different classes: first, those meeting

the case of servants and clerks appropriating their master's property before it reaches his possession; and, secondly, those meeting the case of trustees and bailees appropriating goods of which they obtained possession *bona fide*." 2 Whart. Cr. Law, 7th ed., sec. 1905.

From the opportunities afforded us to investigate authorities, and from the best reflection we have been able to bestow upon the subject, we conclude that the only safe guide in determining what acts will constitute embezzlement, and what persons occupy the relation to the subject upon which the offense may be assigned, will be found in our own Penal Code and its amendments, and the adjudications thereunder, invoking the aid of such light as we may derive from adjudications of other courts under statutes similar to our own.

There are two separate classes of cases defined in the Penal Code in which the crime of embezzlement may be committed. The first is that class found in chapter 3, title 6, of the Penal Code (Pasc. Dig., art. 1854 *et seq.*; art. 235 of the Code), under the head, "Embezzlement or misapplication of public money." To this class belonged the case of *The State* v. *Brooks*, 42 Texas, 62, where it was held that a deputy sheriff is *an officer*, within the meaning of the law punishing embezzlement of public money (which see for an indictment held sufficient).

The other class is found in chapter 10 of title 20 (Pasc. Dig., art. 2421; art. 771 of the Code), under the head of "Embezzlement of property by private persons," and which, as we have already seen, was amended by act of the Fifteenth Legislature. Gen. Laws 1876, p. 9. It is to the latter class that the present case belongs, and it is by the amendment of article 771, made in 1876, that the sufficiency of the indictment against these appellants must be tested.

The counsel for the State, among other cases cited in

support of the proposition that the indictment is sufficient, refer to the case of *Riley* v. *The State*; 32 Texas, 763.    In that case a similar objection was urged to the indictment to the one set out in the first ground in the motion in arrest of judgment in the present case.    The following extract from the opinion on the rehearing indicates sufficiently the basis of the decision :  " The learned counsel overlooked the provision of the Criminal Code which makes ' embezzlement' nothing more than a grade of ' theft.'    The fifth subdivision of article 3096, Paschal's Digest,· says ' theft includes all unlawful acquisitions of personal property punishable by the Penal Code.'    Then, the *law of trial* in a case of theft applies also to a case of embezzlement.    The difference between them is only in the facts and circumstances under which they are committed," etc.

Under some of the English statutes it is true that, under an indictment for embezzlement, if the proof failed to establish the charge, the party accused might, nevertheless, be convicted of larceny, if the proof justified ; and something of the kind must have been in the mind of the judge in the preparation of the opinion just quoted from ; and the quotation above from Mr. Wharton tends somewhat in the same direction ; yet it must be borne in mind that, by the Penal Code of this state, the two offenses of embezzlement and theft are entirely separate and distinct offenses ; the term " theft," in the Texas codes, being synonymous with " larceny," as that term is employed in the English statutes and at common law.    It is true, as stated by the judge in the quotation just made, that one of the subdivisions of article 631 of the Code of Criminal Procedure (Pasc. Dig., art. 3096) enumerates the offenses which include different degrees, and, among them, " Theft—which includes all unlawful acquisitions of personal property punishable by the Penal Code ; " yet it is only " when a prosecution is for an offense consisting of different degrees that the jury may find the

defendant not guilty of the higher degree (naming it), but guilty of any degree inferior to that charged in the indictment." Code Cr. Proc., art. 630 (Pasc. Dig., art. 3075).

Theft may include degrees, and is one of the offenses enumerated in the statute which does include different degrees, whilst embezzlement is not; and, whilst one indicted for theft might be convicted of any degree of fraudulent acquisition of personal property punishable by the Penal Code, inferior to that charged in the indictment —just as one indicted for murder might be convicted of any lesser degree of culpable homicide, on the ground that murder includes such other degrees—yet embezzlement is a separate offense, dependent upon its own circumstances, and does not include different degrees, as do murder, maiming, arson, burglary, and theft. We are of opinion that the opinion in Riley's case is not supported by authority, and is not a correct interpretation and application of the provisions of the Code, and that we cannot regard it as a sound enunciation of the law; and, so far as this court is concerned, it will be considered as overruled in so far as it holds that an indictment for embezzlement will support a conviction on proof of theft.

In *The State* v. *Johnson*, 21 Texas, 775, Johnson was charged, under article 771 of the Penal Code, prior to the amendment of 1876, that he had, as clerk of an Odd Fellows' lodge, received " as clerk, as aforesaid, from divers persons, the sum of sixty dollars of the property of said corporate body, and did then and there convert said sixty dollars to his own use, without the consent of his employers," etc; and it was held that, for the reason that the indictment did not distinctly state that the defendant had the possession or care of this money, by virtue of his clerkship, when he converted it to his own use, it could not be sustained.

In that case the court says: " It is the breach of trust that constitutes the gist of the offense. Unless a duty or

trust has been imposed, there can be no breach of trust. It is not every officer of an institution that is incorporated who can be held liable under this statute, by converting to his own use the money of the institution, but only such officers, clerks, or agents as have the money of their principal or employer (the institution), which shall have come to their possession, or shall be under their care, by virtue of said office, agency, or clerkship. A clerk, then, of an institution, who has nothing to do with its fiscal affairs, and who happens to be in possession of its money, or to have it under his care, otherwise than by virtue of his office or clerkship, is not indictable for its conversion to his own use, because the institution is not his principal in that sense, and has not employed him for that purpose, and has not trusted him with the money. In that case the treasurer would be his principal, or employer, and would have trusted him." This language, whilst perhaps not strictly necessary to the decision, is useful as an interpretation of the statute under consideration, and indicates, not only that a trust relation must exist as to the funds embezzled, but that that relation must exist between the owner of the subject embezzled and the party accused.

In the same opinion it was further said : " The increasing business of the country makes it necessary to trust men as officers, agents, and clerks with money and property who are entirely irresponsible in respect to their means of repayment, should they convert it to their own use ; and who, however good their intentions might be at the time, might not be able to replace it, and who, if they are so disposed, often have the opportunity, from their position, of concealing the detection of its conversion by them. This statute is designed to furnish the principal, or employer, with some guaranty that such officer, agent, or clerk so intrusted shall not convert it to his own use at all, without the consent of such principal or employer."

The same judicial interpretation of the statute, as it then stood, will apply with equal force to the amended form, so far as necessary to this investigation. As in the original article, so in the amended article; the relations of officer and institution, of agent and principal, and of clerk and employer, and the relation to the article or thing intrusted to the officer, agent, or clerk are the same in each. The most material addition made by the amendment is to include the further relation of attorney and client, and to bring the money or property of the client, intrusted to the attorney by virtue of such relation, within its provisions.

In *Wise* v. *The State*, 41 Texas, 137, the indictment charged that the defendant was intrusted, as the *clerk and agent* of W. D. & Co., with the collection and receipts of their money, and this averment, in connection with the averment that, as such clerk and agent, he did receive the money, it was held, sufficiently showed that it was his duty, as clerk, to receive it, and that it was received by virtue of his clerkship. The indictment was held sufficient. In that case the accused was charged with having, as the clerk and agent of W. D. & Co., collected and misapplied the funds of his employers. In *Block* v. *The State*, 44 Texas, 620, the point decided was that an indictment for embezzling money will not be sustained by proof of embezzling United States currency, or national bank-bills; but there was no question on the sufficiency of the indictment.

The defect pointed out in the statute, as it then stood, was cured by the amended article so as to embrace within the subjects of embezzlement, not only money, *eo nomine*, and property, but also town, city, or county scrip, drafts, promissory notes, bank-bills, national bank-notes, treasury-notes of the United States of America, or any article of value, or the proceeds of such property, after sale, coming otherwise within the purview of the statute; and it was further declared by the amendment that " within the mean-

ing of money, as used in this article, is included any circulating medium current as money."

We receive no further light from the Texas cases; there have been no adjudications by the court of last resort construing the amendment to the Code under which this prosecution is attempted. We have already seen the additions made by the amendment to the original article.

It is a rule of construction of penal statutes which deprive the citizen of life, liberty, or happiness — which subject one to punishment or forfeiture, or to summary process — as well as all manner of statutes in derogation of common-law rights, that they are to have a strict construction; and, as said by Mr. Bishop, " such statutes are to reach no further in meaning than their words; no person is to be made subject to them by implication, and all doubts concerning their interpretation are to preponderate in favor of the accused." This rule, however, must be held in subordination to the provisions of our own statutory rules of construction.

The amended article under consideration declares, with reference to the offense charged in the indictment, that if any agent of any incorporated company or institution, or of any city, town, or county, or of any private person or co-partnership, shall embezzle, or fraudulently misapply, or convert to his own use without the consent of his principal, any of the articles enumerated in the amendment — as, money, property, etc. — belonging to such principal, and which shall have come into his possession, or shall be under his care, by virtue of his agency, shall be punished, etc. The controlling words of the statute, so far as they relate to agents, are that the articles or things embezzled, etc., are *belonging to such principal*, or the proceeds, arising from sale, *which shall have come into his possession, or shall be under his care, by virtue of such agency*, and contain two elements: first, the property, money, or other thing charged to have been embezzled, or otherwise misapplied, must be the property

of the principal; and, second, that it be in the possession, etc., of the agent by virtue of his agency. This is the clear import of the words employed in the statute.

The indictment sufficiently charges the appellant John P. Griffin, as the agent of the Texas Express Company, with the receipt of the money alleged to have been fraudulently converted, and that he so received it in virtue of his said agency; but it is not averred that the money belonged to his principal, the Texas Express Company. But it is expressly averred that the money belonged to the Paris Exchange Bank; and between the bank and the accused no trust or fiduciary relation whatever is averred or intimated in the indictment.

The averment in the indictment makes the Texas Express Company the bailee or carrier of the money, and not the defendants. Because the indictment fails to charge any fiduciary relation between the owners of the money and the appellant, and because it fails to charge that the money belonged to the principal of the agent accused, or that the Texas Express Company had any property or interest in the money charged to have been embezzled, it is defective, and insufficient to support the offense defined in the statute. This defect in the indictment disposes of the case as to both the defendants, and necessitates the reversal of the judgment and the dismissal of this prosecution.

Because the indictment is not sufficient to support the offense created by the statute, as herein first above set out, the judgment of the District Court of Lamar County is reversed and this prosecution is dismissed.

*Reversed and dismissed.*